1 | MARC J. FAGEL (Cal. Bar No. 154425)
ROBERT S. LEACH (Cal. Bar No. 196191)
2 |   leachr@sec.gov
JEREMY E. PENDREY (Cal. Bar No. 187075)
3 |   pendreyj@sec.gov

4 | Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
5 | 44 Montgomery Street, Suite 2600
San Francisco, California 94104
6 | Telephone:  (415) 705-2500
Facsimile:  (415) 705-2501

7

*E-filing*

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN JOSE DIVISION

11

**C 07 4430**

12 | SECURITIES AND EXCHANGE COMMISSION,     Civil Action No. _____

**JW**    **RS**

13 |                        Plaintiff,

14 |        v.                                COMPLAINT

15 | JUNIPER NETWORKS, INC.,

16 |                        Defendant.

17

18 |        Plaintiff Securities and Exchange Commission (the "Commission") alleges:

19 |                        **SUMMARY OF THE ACTION**

20 |        1.    From mid-1999 through mid-2003, Juniper Networks, Inc. ("Juniper" or the

21 | "Company"), a Sunnyvale, California company that sells Internet Protocol networking solutions,

22 | concealed hundreds of millions of dollars in expenses from investors, and significantly overstated the

23 | Company's income, by backdating employee stock option grants and failing to properly disclose and

24 | account for its true compensation expenses.

25 |        2.    Under well-settled accounting principles in effect throughout the relevant period,

26 | Juniper was not required to record an expense in its financial statements for options granted to

27 | employees at the market price ("at-the-money"), but *was* required to record expenses for any options

28 | granted below the current market price ("in-the-money").  To help Juniper attract and retain

1  executives and employees with potentially far more lucrative "in-the-money" options, without

2  disclosing to shareholders hundreds of millions of dollars in compensation expenses, Juniper

3  established a scheme to grant in-the-money options while falsifying records to make it appear that the

4  options had been granted at-the-money.

5      3.    By using option grant dates and exercise prices selected with hindsight, Juniper

6  materially understated its expenses, overstated its income (or understated its losses), and falsely

7  represented in certain Commission filings that Juniper had incurred no expense for option grants.

8  The Commission seeks an order enjoining Juniper from future violations of the securities laws, and

9  providing other appropriate relief.

10                          **JURISDICTION AND VENUE**

11      4.    The Commission brings this action pursuant to Section 20(b) and 20(d) of the

12  Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b) and 77t(d)] and Sections 21(d) and

13  21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

14      5.    This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the

15  Securities Act [15 U.S.C. § 77t(b) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act

16  [15 U.S.C. § 78u(d), 78u(e), and 78aa].

17      6.    Juniper, directly or indirectly, made use of the means or instrumentalities of interstate

18  commerce, or of the mails, or of the facilities of a national securities exchange in connection with the

19  transactions, acts, practices, and courses of business alleged herein.

20      7.    This Court is a proper venue for this action pursuant to Section 22 of the Securities

21  Act [15 U.S.C. § 77v], and Section 27 of the Exchange Act [15 U.S.C. § 77aa] because acts,

22  transactions, practices, and courses of business constituting the violations alleged in this Complaint

23  occurred within this district.

24                          **INTRADISTRICT ASSIGNMENT**

25      8.    Intradistrict assignment to the San Jose Division is proper pursuant to Civil Local Rule

26  3-2(c) and (d) because acts or omissions giving rise to the Commission's claims occurred, among

27  other places, in Santa Clara County, California.

28

1

**DEFENDANT**

2       9.      Juniper is a Delaware corporation headquartered in Sunnyvale, California that makes

3 and sells internet-related networking products. From June 1999 through the present, Juniper's

4 common stock has been registered under Section 12 of the Exchange Act and traded on the NASDAQ

5 National Market. At all times relevant to this action, Juniper used a fiscal year ending on December

6 31.

7

**FACTUAL ALLEGATIONS**

8

**Juniper's Stock Option Disclosures**

9       10.      On June 24, 1999, Juniper became a public company through an initial public offering

10 of its stock (an "IPO"). Juniper grew rapidly following its IPO, hiring hundreds of employees

11 through early June 2003. To support this rapid growth and to achieve its recruiting and compensation

12 objectives, Juniper relied heavily on stock options as a recruiting and retention incentive.

13       11.      Each option gave the grantee the right to buy Juniper common stock from the

14 Company at set price, called the "exercise" or "strike" price, on a future date after the option vested.

15 The option was "in-the-money" when granted if the trading price of Juniper's common stock

16 exceeded the option's exercise price. The option was "at-the-money" when granted if the trading

17 price of Juniper's common stock and the exercise price were the same.

18       12.      By compensating employees with stock options, Juniper avoided paying greater

19 salaries or other forms of compensation that would have been necessary to attract and retain

20 employees. Juniper granted stock options to nearly all new full-time employees. Juniper also granted

21 options to existing Juniper employees (called "ongoing" options), based on performance or other

22 factors.

23       13.      As a public company, Juniper filed annual reports on Forms 10-K with the

24 Commission that included audited financial statements, certified by the companies outside auditors.

25       14.      Juniper publicly represented, in audited financial statements and other filings with the

26 Commission made for or during its fiscal years 1999 through 2005, that its stock option grants were

27 made at fair market value. In particular, Juniper stated in its annual reports to shareholders filed with

28 the Commission on Forms 10-K for its fiscal years 1999 through 2005: "Incentive stock options are

1  granted at an exercise price of not less than the fair value per share of the common stock on the date

2  of grant." Juniper further stated in each of those reports on Forms 10-K that, although the Company's

3  plans allowed for the granting of so-called "nonstatutory" stock options at an exercise price of not

4  less than 85 percent of the then-market value, "no nonstatutory stock options have been granted for

5  less than fair market value on the date of the grant."

6      15.    Juniper's public filings also affirmatively stated that the Company accounted for its

7  employee stock option plans in accordance with GAAP, and particularly, that the Company followed

8  Accounting Principles Board's Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB

9  25"). Under APB 25 and the accounting rules in effect during the relevant period, the Company was

10  required to record an expense on its financial statements for the in-the-money portion of any options

11  grant. According to APB 25, that difference between the exercise price (if lower) and the quoted

12  market price on the date of the actual grant must be recorded as compensation expense to be

13  recognized over the vesting period of the option. Consequently, granting in-the-money options to

14  employees could have a significant impact on the expenses and income (or loss) reported to the

15  shareholders of a public company.

16      16.    APB 25 allowed a public company, where the key terms of an option grant were

17  known, to grant employee stock options without recording any compensation expense so long as the

18  option exercise price was not below the market price of the company's stock on the date of the grant.

19  In each of its Forms 10-K filed with the Commission for fiscal years 1999 through 2005, Juniper

20  represented that it had "elected to follow APB 25," and that "[b]ecause the exercise price of the

21  Company's stock options equals the market price of the underlying stock on the date of grant, no

22  compensation expense is recognized."

23      17.    Juniper also sent to shareholders proxy statements announcing its annual meetings of

24  shareholders for 2000 through 2003, filed with the Commission on April 13, 2000, March 28, 2001,

25  April 11, 2002, and March 28, 2003. The proxy statements for 2000, 2001, and 2003, in describing

26  executive compensation and particularly options granted to officers, represented that "options are

27  granted at fair market value on the date of grant." Similarly, the 2002 proxy statement, in responding

28  to a shareholder proposal regarding the Company's repricing (or regranting) of stock options,

COMPLAINT                                    4

1   represented that employees at Juniper who have been awarded stock options "have a right to purchase

2   stock in the future at a price which is the fair market value on the date of the stock option grant."

**The Scheme to Backdate Option Grants**

4       18.     On July 21, 1999, Juniper's Board of Directors created a three-member Stock Option

5   Committee ("Stock Option Committee") consisting of Juniper executives, to which it delegated

6   authority to grant stock options to Juniper's non-executive employees.  One purpose in creating the

7   Stock Option Committee was to enable Juniper to have more flexibility in granting options.  The

8   Stock Option Committee held few, if any, actual meetings.

9       19.     From mid-1999 to mid-2003, a Juniper executive, who has since left the Company,

10  unilaterally determined with hindsight the date for most Juniper stock option grants.  In addition, the

11  executive routinely created backdated "minutes" for Stock Option Committee meetings that never

12  occurred.

**Juniper Backdated New Hire Stock Option Grants**

14      20.     Beginning in the second half of 1999, the Juniper executive routinely prepared

15  backdated stock option grants to issue options to groups of recently hired employees of Juniper.  For

16  these new hire grants, the executive collected the names of recently hired employees and had lists

17  prepared.  The executive then selected as the exercise price of the new hire grants the closing price of

18  Juniper's stock on a date in the past, reflecting the low closing price during a particular period around

19  the time the employees were hired.  For each backdated grant from 1999 through 2003, the executive

20  then created Stock Option Committee meeting "minutes" that falsely stated that the Stock Option

21  Committee had met on the date of the low closing price and granted options on that date.

22      21.     The executive signed the backdated committee "minutes" as a Stock Option

23  Committee member.  In addition, for each backdated grant the executive either presented the minutes

24  to the other Stock Option Committee members for signature or stamped the minutes with a signature

25  stamp the executive maintained bearing the other Stock Option Committee members' signatures.

26      22.     Once the executive selected a backdated grant date and a corresponding exercise price,

27  the executive informed Juniper's stock administrator, who then entered the grants into Juniper's stock

28

COMPLAINT                                    5

1    option tracking software using the backdated date as the grant date. Juniper did not reflect in its

2    books an expense related to the in-the-money portion of the options.

3         23.    For example, Juniper granted options to six new Juniper employees on the purported,

4    but false, grant date of October 27, 1999. The six employees were hired on Monday, October 25,

5    1999, at which time Juniper's stock traded at $257.75. Juniper's stock price dipped to a low of

6    $249.94 on Wednesday, October 27, then rose to $275.63 by the end of the week. The Juniper

7    executive actually selected the grant date in mid-November 1999, when Juniper's stock was trading

8    around $283.50, using information about Juniper's historical closing prices for its stock during the

9    week the employees were hired.

10        24.    Similarly, Juniper granted stock options to employees hired between October 8, 2002

11   through January 2, 2003, using the backdated January 2, 2003 closing price of $7.36 as the purported

12   "fair market value" of the stock on the grant date. The Stock Option Committee never met on

13   January 2, 2003. Instead, during mid-February, when Juniper's stock was trading around $9 per

14   share, the executive selected that earlier January 2 date. The January 2, 2003 closing price for

15   Juniper's stock, $7.36, used as the exercise price, was Juniper's lowest closing price of the year up to

16   the time the executive selected the grant date.

17        25.    Using dates selected with hindsight between mid-June 1999 through the end of May

18   2003, the Juniper executive backdated more than 50 grants to groups of new employees. More than

19   $300 million in expenses associated with the in-the-money portion of those grants were not disclosed

20   by Juniper as a consequence of the scheme.

21                      **Juniper Backdated "Ongoing" Stock Option Grants**

22        26.    From mid-1999 through mid-2003, Juniper also backdated performance-related grants

23   to existing employees and officers, which Juniper called "ongoing" grants. Juniper thus backdated

24   large grants to officers and employees that were made to create retention and performance incentives

25   (and which at times included new hires), on approximately nine occasions.

26        27.    For instance, Juniper granted options to a large group of existing employees and

27   officers (and to certain new hires), which it called an "evergreen" grant, using the backdated grant

28   date of October 4, 1999. The Stock Option Committee did not meet on October 4, 1999, and no one

COMPLAINT                                    6

1   determined to grant the employees and officers options that day. Instead, on November 5, 1999,

2   when Juniper's stock price traded at $273.13, the Juniper executive created Stock Option Committee

3   meeting minutes dated October 4, 1999, when Juniper's stock priced closed at $182.13 – the lowest

4   price of that quarter to date. The executive subsequently caused Juniper's Board of Directors to be

5   falsely informed that the grant had been made on October 4, 1999. More than $100 million in

6   expenses associated with the in-the-money portion of this "evergreen" grant were not disclosed by

7   Juniper.

8          28.    On occasion, Juniper granted "pools" of stock options to certain business units to be

9   awarded to employees based on the discretion of the business unit manager. On seven different

10  occasions between 2000 and 2003, Juniper backdated "pool" grants (which also included certain

11  grants to new hires). More than $200 million in expenses associated with the in-the-money portion of

12  these "pool" grants were not disclosed by Juniper.

13         29.    For example, Juniper granted options to existing employees and senior executives (as

14  well as some new hires) in one such "pool" grant, using the backdated grant date of December 21,

15  2000. Juniper's stock price closed at $93.94 on December 21, 2000, which was the lowest stock price

16  of the six months up to that date. No Stock Option Committee meeting occurred on that date. The

17  grant was actually made in or around early January 2001, when Juniper's stock price was trading over

18  $100 per share.

19         30.    In the spring of 2001, Juniper's stock price had declined substantially from the levels

20  experienced during 1999 and 2000. Consequently, many options awarded during those earlier years

21  had strike prices well above the then-current stock price (known as "underwater" options).

22         31.    In approximately April 2001, Juniper instituted a program to award additional options

23  to existing employees using a formula based on the number of underwater options each employee

24  then had, and the length of time each had been employed by Juniper. As part of the program, Juniper

25  granted one block of this "formula" grant using as the grant date April 4, 2001, when Juniper's stock

26  price closed at $29.19. The Juniper executive caused the grant to be backdated to April 4, selecting

27  that date with hindsight on or about April 19, 2001, when Juniper's stock price had more than

28  doubled to $65.58.

COMPLAINT                                          7

1

2                    **Juniper Falsely Reported Its Financial Results**

3          32.     As a public company, Juniper filed with the Commission annual reports on Form 10-K

4   that included the audited financial statements, certified by the companies' outside auditors, which

5   falsely represented Juniper's financial results. Due to Juniper's failure to record an expense for in-

6   the-money options, Juniper's financial statements were materially misstated in each fiscal year from

7   1999 through 2005.

8          33.     For example, for its fiscal year 2001, Juniper originally reported a loss of $13.4

9   million. However, after the company ultimately recorded a compensation expense for previously

10  undisclosed in-the-money option grants in restated financials for this period, the Company reported

11  an additional expense of $513.1 million, which (after adjusting for taxes) brought Juniper's loss for

12  the year to $501.5 million.

13         34.     Similarly, for its fiscal year 2003, Juniper originally reported net income of $39.2

14  million, representing the Company's first profitable year ever. As a result of Juniper's failure to

15  record a compensation expense for backdated, in-the-money option grants, Juniper's pre-tax income

16  was reduced by $19.3 million, which, after adjusting for taxes, reduced its net income to $30.7

17  million for the year, a profit reduction of 21.68%.

18         35.     Juniper also publicly announced quarterly financial results, which were described in

19  financial statements included in quarterly reports filed with the Commission on Forms 10-Q, that

20  were materially false and misleading due to Juniper's failure to record compensation expenses

21  associated with in-the-money options. Thus, Juniper's quarterly reports filed on Forms 10-Q

22  beginning with the quarter ended September 30, 1999, and for each of the Company's first three

23  quarters in fiscal years 2000 through 2002, and the first two quarters of fiscal year 2003, contained

24  materially false and misleading financial statements.

25         36.     Juniper filed with the Commission current reports on Forms 8-K on April 10, 2003,

26  July 10, 2003 and October 9, 2003, each of which included announcements about the Company's

27  financial results for prior quarters that were materially false and misleading due to Juniper's failure to

28  record compensation expenses associated with undisclosed grants of in-the-money stock options.

COMPLAINT                                        8

1    37.    Juniper filed with the Commission registration statements on Form S-8 on March 14,

2 2000, August 18, 2000, December 12, 2000, March 29, 2001, December 21, 2001, July 9, 2002, April

3 21, 2004, August 18, 2004, May 3, 2005, May 4, 2005, July 6, 2005 and March 7, 2006, each of

4 which incorporated by reference false and misleading periodic reports.

5    38.    In May 2006, the audit committee of Juniper's board of director's began to investigate

6 the Company's historical options granting practices.  As a result of the audit committee investigation,

7 Juniper announced in March 2007 restated financial results to record expenses for options granted to

8 employees.  Juniper announced the recording of additional pre-tax, non-cash, stock-based

9 compensation expense of $894.7 million for fiscal years 1999 through 2005 under APB 25.

10    **FIRST CLAIM FOR RELIEF**

11    **Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

12    39.    The Commission realleges and incorporates by reference paragraphs 1 through 38

13 above.

14    40.    By engaging in the conduct described above, Juniper, directly or indirectly, in

15 connection with the purchase or sale of securities, by the use of means or instrumentalities of

16 interstate commerce, or the mails, with scienter:

17        a.    Employed devices, schemes, or artifices to defraud;

18        b.    Made untrue statements of material facts or omitted to state material facts

19            necessary in order to make the statements made, in the light of the circumstances

20            under which they were made, not misleading; and

21        c.    Engaged in acts, practices, or courses of business which operated or would operate

22            as a fraud or deceit upon other persons, including purchasers and sellers of

23            securities.

24    41.    By reason of the foregoing, Juniper has violated and, unless restrained and enjoined,

25 will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17

26 C.F.R. § 240.10b-5].

27

28

1

**SECOND CLAIM FOR RELIEF**

2

**Violations of Securities Act Section 17(a)(1)**

3      42.    The Commission realleges and incorporates by reference Paragraphs 1 through 38

4  above.

5      43.    By engaging in the conduct described above, Juniper, directly or indirectly, in the offer

6  or sale of securities, by use of the means or instruments of transportation or communication in

7  interstate commerce or by use of the mails, with scienter, employed devices, schemes, or artifices to

8  defraud.

9      44.    By reason of the foregoing, Juniper violated and, unless restrained and enjoined, will

10  continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)].

11

**THIRD CLAIM FOR RELIEF**

12

**Violations of Securities Act Sections 17(a)(2) and (3)**

13      45.    The Commission realleges and incorporates by reference Paragraphs 1 through 38

14  above.

15      46.    By engaging in the conduct described above, Juniper, directly or indirectly, in the offer

16  or sale of securities, by use of the means or instruments of transportation or communication in

17  interstate commerce or by use of the mails:

18          a.   Obtained money or property by means of untrue statements of material fact or by

19              omitting to state a material fact necessary in order to make the statements made, in

20              light of the circumstances under which they were made, not misleading; and

21          b.   Engaged in transactions, practices, or courses of business which operated or would

22              operate as a fraud or deceit upon the purchasers.

23      47.    By reason of the foregoing, Juniper has violated and, unless restrained and enjoined,

24  will continue to violate Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and

25  (3)].

26

27

28

COMPLAINT                                      10

1

## FOURTH CLAIM FOR RELIEF

2

### Violations of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, 13a-11,
### and 13a-13 Thereunder

3

4    48.    The Commission realleges and incorporates by reference Paragraphs 1 through 38

5   above.

6    49.    Based on the conduct alleged above, Juniper violated Section 13(a) of the Exchange

7   Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§

8   240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13], which obligate issuers of securities registered

9   pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to file with the Commission accurate

10  periodic reports, including annual, current, and quarterly reports.  Unless restrained and enjoined,

11  Juniper will continue to violate Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules

12  12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and

13  240.13a-13].

14

## FIFTH CLAIM FOR RELIEF

15

### Violations of Exchange Act Section 13(b)(2)(A)

16    50.    The Commission realleges and incorporates by reference Paragraphs 1 through 38

17  above.

18    51.    Based on the conduct alleged above, Juniper violated Section 13(b)(2)(A) of the

19  Exchange Act [15 U.S.C. § 78m(b)(2)(A)], which obligates issuers of securities registered pursuant to

20  Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to make and keep books, records and accounts

21  which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets

22  of the issuer.  Unless restrained and enjoined, Juniper will continue to violate Section 13(b)(2)(A) of

23  the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

24

## SIXTH CLAIM FOR RELIEF

25

### Violations of Exchange Act Section 13(b)(2)(B)

26    52.    The Commission realleges and incorporates by reference Paragraphs 1 through 38

27  above.

28

COMPLAINT                                11

1         53.     Based on the conduct alleged above, Juniper violated Section 13(b)(2)(B) of the

2  Exchange Act [15 U.S.C. § 78m(b)(2)(B)], which obligates issuers of securities registered pursuant to

3  Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to devise and maintain a sufficient system of

4  internal accounting controls. Unless restrained and enjoined, Juniper will continue to violate

5  13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

6                  **SEVENTH CLAIM FOR RELIEF**

7          **Violations of Exchange Act Section 14(a) and Rule 14a-9 thereunder**

8         54.     The Commission realleges and incorporates by reference Paragraphs 1 through 38

9  above.

10        55.     Based on the conduct alleged above, Juniper violated Section 14(a) of the Exchange

11  Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9], which prohibits

12  solicitations by means of a proxy statement, form of proxy, notice of meeting or other

13  communication, written or oral, that contains a statement which, at the time and in the light of the

14  circumstances under which it was made, was false or misleading with respect to any material fact, or

15  which omits to state any material fact necessary in order to make the statements therein not false or

16  misleading or necessary to correct any statement in any earlier communication with respect to the

17  solicitation of a proxy for the same meeting or subject matter which had become false or misleading.

18  Unless restrained and enjoined, Juniper will continue to violate Section 14(a) of the Exchange Act

19  [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9].

20                       **PRAYER FOR RELIEF**

21        WHEREFORE, the Commission respectfully requests that this Court:

22                            **I.**

23        Permanently enjoin Juniper from directly or indirectly violating Section 17(a) of the Securities

24  Act [15 U.S.C. § 77q(a)] and Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the

25  Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B) and 78n(a)], and Rules

26  10b-5, 12b-20, 13a-1, 13a-11, 13a-13, and 14a-9 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1,

27  240.13a-11, 240.13a-13, and 240.14a-9] thereunder;

28

**II.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

**III.**

Grant such other relief as this Court may deem just and appropriate.

Respectfully submitted,

Dated:  August 28, 2007

Jeremy E. Pendrey
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION